**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ALYSSA MARIE HILLMER** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  21-2182** |
| | : | |
| **ESURANCE PROPERTY AND** | : | |
| **CASUALTY INSURANCE COMPANY** | : | |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                                    **September 10, 2021**

A car hit a sixteen-year-old walking to her high school in Florida. The student lived with her mother in Florida during the school year under a joint custody order requiring her to also live with her father in Pennsylvania on regular breaks and for extended summer weeks. The student suffered several serious injuries from the accident. After the underinsured driver's insurer tendered policy limits, the student sought coverage through her Pennsylvania father's underinsured motorist insurance policy. The father's insurer denied coverage arguing it does not cover the student living with her mother in Florida at the time of the accident since she could not be considered a resident of her father's household. The student sued and the parties now cross-move for summary judgment solely on the issue of whether the insurer may deny coverage because the student is not a resident of her father's household as a matter of law. The issue is whether the parents' detailed joint custody order requiring the student to stay in her father's Pennsylvania home at scheduled certain and extended times every year with expected obligations here, along with other facts evidencing a set obligation to live with her father, is sufficient to find she resided in her father's household and is covered by his auto insurance policy as a matter of law. The parties agree there are no genuine issues of material fact. The unique nature of this detailed joint custody order combined with the other undisputed facts confirms her residency in her father's household as a matter of law. We

grant the student summary judgment on the issue of her residency in her father's household under her father's auto insurance policy.

## I.      Undisputed material facts.[1]

A driver of a car hit sixteen-year-old Alyssa Hillmer as she walked to school in Hillsborough County, Florida on the morning of September 13, 2018.[2]  The driver could not satisfy Alyssa's losses. Alyssa made a claim for underinsured motorist coverage with her father and stepmother's auto insurer, Esurance Property and Casualty Insurance Company. Esurance denied coverage arguing its policy does not cover Alyssa because she did not reside in her father's "household" at the time of the accident.

### *Alyssa's living arrangement under a joint custody order from December 2007 to March 2018.*

Alyssa Hillmer grew up in Pennsylvania splitting time in the households of her separated parents, Kimberly Hillmer and Michael Black.[3] Both parents lived in Pennsylvania at the time of the separation and for most of Alyssa's elementary, middle school, and early high school years. Alyssa's father, Michael Black, married Marnie Black in 2006 when Alyssa was three years old.

The parties do not provide us with Alyssa's living arrangements from the time of her birth in 2002 to 2007, but the record shows the entry of a custody order in December 2007.[4]  Alyssa's parents agreed to shared legal custody, with her mother Kimberly Hillmer having primary physical custody and her father Michael Black having partial physical custody. The parents agreed to Michael's partial physical custody every other weekend from Friday afternoon to Sunday afternoon; four days each Thanksgiving; four days over either Christmas or New Year in alternating years; and two weeks over summer.[5] Kimberly and Michael generally followed the 2007 custody order although they adjusted to Alyssa's school and extracurricular schedules.[6]

Alyssa lived primarily with Kimberly in Old Forge, Pennsylvania, where she attended school at Old Forge Elementary and later, Old Forge High School.[7]

Alyssa always had her own bedroom in Michael and Marnie's home where she kept her clothes, shoes, and coats as well as other personal items.[8] She completed homework at the Blacks' home, sometimes with the help of Marnie, a teacher.[9] Alyssa babysat her younger half-siblings when she lived with Michael and Marnie. She helped with household chores such as cooking, laundry, and dishes, and helped with home renovation projects like painting the basement.[10] She received birthday and holiday cards at the Blacks' Pennsylvania home.[11] Her eye doctor is located in Pennsylvania.[12] She had access to a key to enter the Blacks' home.[13] Stepmother Marnie considers Alyssa to be her child and a part of her household.[14] Michael financially supported Alyssa, and the Blacks provided Alyssa with health insurance through Marnie's employer. Alyssa's mother Kimberly testified she and Michael "both tak[e] care of" Alyssa, she "lives with both of us," and, as her parents, they "consult about everything" relating to Alyssa's care.[15]

***Alyssa's mother moves to Florida with father's consent in March 2018
under a new custody order.***

Kimberly decided to move to Tampa, Florida in March 2018. Michael consented to the move. Kimberly and Michael entered a custody order continuing their shared legal custody, Kimberly's primary physical custody, and Michael's partial physical custody.[16] The custody order from the Court of Common Pleas of Chester County granted Michael physical custody of Alyssa for up to six consecutive weeks each summer, and fall, winter, and spring breaks from school.[17] The state court judge further required Kimberly to pay the airfare for Alyssa to travel to and from Michael's home to effectuate his periods of partial physical custody.[18]

Alyssa attended Armwood High School in Florida for two months until school ended for the summer 2018. Alyssa then returned to Pennsylvania to the Blacks' home for the summer as

required by the court order. She then complied with the court order by returning to Florida before school started in August 2018.[19]

Alyssa returned to live with the Blacks in Pennsylvania for about ten days over Thanksgiving and two weeks over Christmas break in 2018.[20] Alyssa stayed with her mother Kimberly in Florida over her 2019 spring break because the Blacks planned a family vacation to Disney World in Florida.[21] Alyssa spent a week at Disney World with the Blacks.[22] She returned to their Pennsylvania home for a majority of the 2019 summer.[23]

***Stepmother Marnie Black applies for auto insurance from Esurance in April 2018.***

Alyssa's parents agreed on insuring her safety, including covering Alyssa's health care under Marnie's coverage through her employer. On April 22, 2018, after Alyssa moved to Florida with her mother Kimberly, Marnie Black completed a "Personal Automobile Insurance Application" with Esurance.[24] Esurance required Marnie to identify: "You, your spouse, all members of your household 14 years or older and all regular or occasional drivers of the vehicles described in this Application are listed above."[25] Marnie listed herself and Michael Black under the "Driver and Resident Information" section but did not list Alyssa, then over the age of fourteen.[26]

Marnie testified she read the "Driver and Resident Information" language when completing the Application.[27] She testified she omitted Alyssa from the Application because she knew Alyssa did not have a driver's license and because she "didn't know what [the Application] meant by member of household."[28] Marnie feared the language could have tax implications causing her to inadvertently claim Alyssa as a dependent.[29] Marnie claims she did not have access to the insurance policy including its definitions when she completed the Application for coverage.[30] She instead recalls receiving the policy after completing the Application and providing payment.[31]

Esurance then issued an automobile policy of insurance (the "Policy") effective May 29, 2018.[32] Esurance insures Marnie and Michael Black as "rated operators" under the Policy, listing Marnie Black as the named insured and Michael Black as an additional driver.[33] The Policy does not name Alyssa as a driver.[34] There is no dispute Alyssa did not have a driver's license at the time Marnie filled out the Application.

### *Terms of the Policy.*

The Blacks and Esurance agree Alyssa must be an "insured" to be entitled to Uninsured and Underinsured Motorist coverage under the Policy.[35] They agree the term "insured" as used in the Uninsured and Underinsured Motorist Coverage section of the Policy is defined as:

A. ***"You"***;
B. Any ***"family member"*** ;
C. other person ***"occupying"*** a ***"covered auto"*** with permission from ***"you"*** or a ***"family member"***; or
D. Any person for damages that person is entitled to recover because of ***"bodily injury"*** to which this coverage applies that has been sustained by an ***"insured"*** defined in **1.A.**, **1.B.**, or **1.C.** above.[36]

The term "family member" is defined in the general definition section of the Policy applying to all coverages. "***Family member***" means:

A. Any person related to ***"you"*** by blood, marriage, or adoption who is a resident of ***"your"*** ***"household"***;
B. ***"Your"*** ward or foster child who resides in ***"your"*** ***"household"***; and
C. Any minor child in ***"your"*** custody or in the custody of a person who is related to ***"you"*** and resides in ***"your"*** ***"household"***.[37]

The term "household" is defined in the same general definition section of the Policy applying to all coverages:

"***Household***" consists of:

A. ***"You"***;
B. ***"Family members"***;

    C.  Any domestic partners;
    D.  Unrelated roomers;
    E.  Boarders; and
    F.  Other people who are not related to ***"you"***;
who live together in the same housing unit. A housing unit includes a single home, apartment, condominium, mobile home, trailer, or a single room that is self-contained and located at the address listed in ***"your"*** Declarations page.[38]

### *Alyssa is injured in an accident in September 2018.*

A driver struck Alyssa as she walked to her Florida high school on the morning of September 13, 2018.[39] Brandon Regional Hospital treated her injuries. Alyssa alleges she suffered multiple serious and permanent injuries as a result of the accident, including traumatic brain injury, concussion, and cognitive dysfunction; fractured left distal humeral shaft and radial head; permanent nerve damage in left elbows (left median nerve lesion and left anterior branch antebrachial cutaneous nerve lesion); disc bulges at C3-4, 4-5, 5-6, 6-7; cervical intervertebral disc displacement; left shoulder injury; neck and back pain; lesion of the ulnar nerve; headaches, nausea, dizziness, and memory loss; and depression, post-traumatic stress disorder, and adjustment disorder with anxiety.[40]

### *Esurance denies Alyssa's claim for underinsured motorist benefits under the Blacks' Policy.*

After the driver's insurer tendered policy limits, Alyssa presented a claim for underinsured motorist insurance benefits under the Blacks' auto Policy with Esurance in March 2020.[41] Esurance denied Alyssa's claim in an April 24, 2020 letter to Alyssa's Florida counsel.[42] Esurance denied the claim because it issued the Policy two months ***after*** Alyssa relocated to Florida with her mother; Marnie did not list Alyssa under the "Driver and Resident Information" section of the Application despite the requirement she list "all members of your household 14 years or older and

all regular or occasional drivers of the vehicles described in this Application . . ."; and Alyssa was not a "resident" of the Blacks' household in Pennsylvania at the time of the accident.[43]

Alyssa sued Esurance claiming its denial constitutes a breach of contract, bad faith, and a violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law.[44]

## II.    Analysis[45]

The parties now cross-move for summary judgment on the threshold issue of Alyssa's residency before completing discovery on the merits of the underlying claims and damages. The parties agree there are no genuine issues of material fact regarding Alyssa's living arrangements with Michael and Marnie in Pennsylvania and Kimberly in Florida and judgment may be entered as a matter of law. Both parties agree the key question is whether Alyssa is a resident of the Black household under the Policy's coverage.

Alyssa argues she is entitled to judgment as a matter of law and is covered under the Policy because (1) the Application and Policy are ambiguous; (2) she is a resident of the Blacks' home under Pennsylvania law; and (3) public policy requires a "modern-day" interpretation of the term "resident."

Esurance argues Alyssa is not entitled to underinsured motorist coverage because (1) she did not "reside" in the Blacks' household at the time of the accident; and (2) Marnie chose not to name Alyssa as a member of the household on the insurance application.

### A.    We interpret the agreed Policy language as a contract.

The parties do not dispute Pennsylvania law applies to the Policy.[46] When interpreting insurance contracts under Pennsylvania law, our "primary consideration . . . is 'to ascertain the intent of the parties as manifested by the language of the written instrument.'"[47] We must read the Policy as a whole and construe it according to the plain meaning of its terms.[48] We construe

"[w]ords of common usage. . .  'in their natural, plan, and ordinary sense, with a court free to consult a dictionary to inform its understanding of terms.'"[49]

In Pennsylvania, "[t]he interpretation of an insurance contract is a question of law."[50] We must give effect to clear and unambiguous policy language.[51] We must interpret an insurance policy to avoid ambiguities and give effect to all policy provisions."[52] Where contract language is ambiguous, we construe the language in favor of the insured.[53] An insurance contract is ambiguous where it is "reasonably susceptible of different constructions and capable of being understood in more than one sense."[54] We must not "distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity."[55]

Alyssa contends the Application and Policy contain ambiguous language which should be construed against Esurance.[56] Esurance argues the Policy, specifically the term "resident," is unambiguous.

We agree with Esurance the term "resident" is unambiguous. The Policy provides underinsured motorist coverage to an "insured." As relevant here, the Policy's definition of an "insured" includes a "family member." "Family member" is defined as (a) any person related to "you" by blood, marriage, or adoption ***who is a resident*** of "your" "household"; (b) "Your" ward or foster child ***who resides in*** "your" "household"; and (c) any minor child in "your" custody or in the custody of a person who is related to "you" and ***resides in*** "your" "household.[57]  Each of the three categories of persons coming within the definition of "family member" have a residency requirement; the person must be a resident of, or reside in, "your" "household." "Household," in turn, is defined as consisting of "(a)"You"; (b) "Family members"; (c) any domestic partners; (d) unrelated roomers; (e) boarders; and (f) other people who are not related to "you" who live together in the same housing unit. A housing unit includes a single home, apartment, condominium, mobile

home, trailer, or a single room that is self-contained and located at the address listed in "your" Declarations page."[58]

Esurance does not dispute Alyssa, as Michael's daughter, is related to him by blood. The issue is whether Alyssa is a "resident" of the Blacks' "household." The terms "reside" and "resident" are not defined in the Policy.

Alyssa argues the undefined terms "resident" and "reside" create a "reasonable question as to the legality of including children of divorced parents on the Policy" and "allow reasonably intelligent persons to construe the language with different meanings" making the Policy ambiguous and must be construed against Esurance and in favor of coverage. But Alyssa does not explain how the word "resident" has different meanings; her argument is we may interpret the word "resident" or "resides" to meet the facts in this case. [59]

Esurance responds the Policy is unambiguous. It argues Pennsylvania courts have addressed the terms "reside" and "resident" and consistently hold these terms in similar policy provisions are unambiguous.

"Under Pennsylvania law, an insurance contract is ambiguous where it: '(1) is reasonably susceptible to different constructions, (2) is obscure in meaning through indefiniteness of expression, or (3) has a double meaning.'"[60] We give "straightforward language" in the Policy its natural meaning; the parties' disagreement over the meaning of the disputed language does not make it ambiguous.[61]

Alyssa contends Pennsylvania courts have found the terms "resident" and "resides" – without "words of refinement" – are ambiguous. She cites three Pennsylvania cases supporting her argument: *Erie Insurance Co. v. Flood*;[62] *Nationwide Insurance Co. v. Frazier*;[63] and *Krager v.*

*Foremost Insurance Co.*[64] These cases are distinguishable and against the weight of more recent Pennsylvania decisions and federal decisions applying Pennsylvania law.[65]

In *Flood*, a son who lived between the houses of his divorced parents got into a car accident while driving. The injured passengers in son's car sought coverage under the mother's policy. The mother did not specifically name or identify her son as an insured under her policy and, under the policy's terms, an individual who is not a named insured must be a "relative" of the named insured to receive liability coverage. The policy defined "relative" as a person who is related to the named insured by blood, marriage, or adoption ***and*** who is a "resident" of the named insured's household.[66] Because no one disputed the son is a "relative" of his mother the policyholder, the trial court analyzed whether son qualified as a "resident" of his mother's household.

The trial court found the terms "resident" and "relative" ambiguous and, construing the ambiguity against the insurer, concluded the son qualified as both a relative within the meaning of the policy and a resident of his mother's household at the time of the accident. Erie appealed, arguing the trial court erred in finding the terms "relative" and "resident" ambiguous. The Pennsylvania Commonwealth Court affirmed the trial court. It concluded under Pennsylvania law, "resident" is defined "as meaning one who actually resides in the household of the insured."[67] But the Pennsylvania Superior Court's definition of "resident" in an earlier decision left open the question of whether a relative can be a resident of more than one household. The Commonwealth Court found the insurer's "failure to elaborate on the definitions of 'relative' and 'resident' created an ambiguity as to whether the policy contemplated coverage to dual residents."[68] The Commonwealth Court did not find the term "resident" ambiguous; in fact, it recognized the term had already been defined by the Pennsylvania Superior Court. The ambiguity in *Flood* arose because of the insurer's failure to clarify the definitions of "relative" and "resident" in the context

of whether the policy provided coverage to the son–a dual resident of both his mother's and father's households. We do not have the same ambiguity here and Pennsylvania courts and federal courts within our Circuit applying Pennsylvania law "have agreed or at least assumed that a person is not limited to one residence."[69]

In *Frazier*, an insurer sought to vacate the award of damages to the estate of a minor child killed in a car accident. The child of divorced parents went back and forth between her parents' homes. The father's uninsured motorists coverage provided coverage to any "family member" defined as a "person related to you by blood . . . who is a resident of your household . . .."[70] The insurer appealed the arbitrators' finding the child a "resident" of both her mother's and her father's household and thus entitled to coverage under her father's policy. The trial court affirmed the arbitrators' decision, finding sufficient evidence the child resided in both her mother's and father's households. The trial court found the insurer could have, but did not, define the term "resident of your household," making it ambiguous.[71] The trial court spent little time on the ambiguity issue finding even if the term "resident of your household" is unambiguous, the arbitrators properly held the child a resident of both her parents' households.[72]

In *Krager*, the Pennsylvania Superior Court affirmed the trial court's finding mother's homeowner's policy covered her adult son's accident on a garden tractor operated on the mother's property. The mother's policy provided coverage to an "insured" defined "you and the following *residents* of you [sic] household: a. your relatives."[73] The son lived in a home he owned in New York and resided with his mother at her Pennsylvania home seven months of the year. The accident occurred while son stayed with his mother. The mother's insurer denied coverage arguing the son is not a "resident" of his mother's household and does not come within the policy's definition of "insured." The Pennsylvania Superior Court disagreed with the insurer, noting the difference

Pennsylvania courts ascribe to "domicile" and "residence": "Domicile being that place where a man has his true, fixed and permanent home and principal establishment, and to which whenever he is absent he has the intention to returning" while "[r]esidence [is] a factual place of abode. Living in a particular place, requirement only physical presence."[74] The Superior Court recognized both words may be used in the same context, but the policy's use of the word "resident" "without additional words of refinement" such as "permanent" or "legal," carry a "more transitory meaning."[75] The Superior Court did not find the term "resident" ambiguous; it simply noted the well-settled principle any ambiguity in the contract will be construed against the insurer. The Superior Court found son "was clearly a resident relative" of the mother and within coverage of the policy.[76]

We do not find these three cited cases persuasive particularly considering more recent case law under Pennsylvania law defining "resident" or "residency." For example, in *First Liberty Insurance Corporation v. McGeehan*, our Court of Appeals last year addressed whether a married couple injured in a car accident while driving a vehicle covered by the husband's parents' insurance came within the policy's underinsured motorist coverage.[77] Our Court of Appeals found the policy's definition of "family member" to be unambiguous. It then examined whether the married couple were "residents" of the parents' household, and thus "family members," entitled to coverage. The policy did not define "resident." Our Court of Appeals applied the Pennsylvania courts' definition of "residence" as "a physical fact" requiring "at a minimum, some measure of permanency or habitual repetition."[78] Our Court of Appeals did not find the term "residence" or "resident" ambiguous.

The Pennsylvania Superior Court's decision in *Amica Mutual Insurance Company v. Donegal Mutual Insurance Company*, relied on by our Court of Appeals in *McGeehan*, applied

"the common law definition of 'resident' [] to the policy language in question."[79] Even though the insurance policy "contain[ed] no words of refinement, such as 'legal' or 'permanent[,]'" the court interpreted resident to be one "who actually reside[s] in the household of the insured."[80] Because Pennsylvania courts repeatedly find a uniform definition of "resident" and similar terms, we find Esurance's use of "resident" clear and unambiguous.

### B.    Esurance agreed to cover Alyssa as a resident of her father's household.

The parties agree on the material facts surrounding Alyssa's living arrangements in 2018. The key legal issue is whether Alyssa, a minor at the time of the accident, is a resident of her father Michael's household as defined in the Policy. Alyssa contends she resided in her father's home and is entitled to coverage under the Blacks' Policy. Esurance argues Alyssa did not reside in the Blacks' household at the time of the accident.

We are guided by the reasoning from several judges addressing residency for purposes of coverage. These cases focus on staying in a household on a more scheduled permanent basis. The parties have not cited, and we cannot find, a court yet addressing the impact of a detailed court order requiring the minor live with the divorced parent at scheduled identified times each year for several years. We find this Pennsylvania court order combined with a number of undisputed facts requires we find Alyssa resided in her father's household in 2018.

### 1.    Children of divorced parents may reside in both parents' households.

The Pennsylvania Superior Court in *Amica Mutual Insurance Co. v. Donegal Mutual Insurance Company* over thirty years ago recognized a child of separated or divorced parents may be a resident of the household of both parents under Pennsylvania law.[81] In *Amica*, an eighteen-year-old driver of divorced parents caused an accident injuring two minor passengers in her car. One of the passengers sued the driver. The driver's father had an auto liability policy. The father's

insurer denied coverage. The mother purchased a policy from another insurer and sought a declaratory judgment seeking to have the father's insurer declared liable for coverage.

The father's policy insured a "covered person" defined as "[y]ou or any family member." The policy defined "family member" as "a person related to you by blood, marriage or adoption who is a resident of your household. This includes a ward or foster child."[82] The trial court found the driver did not reside with her father and instead resided with her mother at the time of the accident and the father's insurer had no duty to provide coverage. The mother's insurer appealed.

The Superior Court first explained courts must consider both the "object and context" of the word "residence."[83] The Superior Court agreed with the father's insurer the policy language providing coverage to family members of the insured who are residents of the insured's household evidences the policy's objective to limit coverage to family members who actually live in the same household as the insured.[84] As for context, the Superior Court, relying on its decision in *Krager*, concluded the word "resident" in the context of the policy "without additional words of refinement" has a "more transitory meaning."[85] Applying the common law definition of "resident" to the policy, the Superior Court construed the language "to limit coverage to those who actually reside in the household of the insured."[86]

At the time of the accident, daughter driver lived with her mother and testified she stayed overnight at her father's house three to five times a month. The father had a different version of his daughter's visits, testifying she stayed overnight only twice during the entire school year. The daughter kept clothes and shoes at her father's house, as well as books, cosmetics, sports equipment, personal items, and a pet rabbit. She also received mail at her father's home. She intended to live with her father between her high school graduation and the time she left for college. The father did not list his daughter as a resident of his household on his tax returns. Based on these

facts, the trial court determined "as a matter of physical fact, [the daughter] resided at her mother's house at the time of the accident" and made only "sporadic" visits to her father's house over the course of ten months and "spent no significant time" there. The trial court found the daughter kept personal items at her father's house for convenience and "did not evidence that she physically lived there."[87] The Superior Court affirmed the trial court's finding the driver daughter was not a "resident" of her father's household.[88]

### 2. Our Court of Appeals, relying on Pennsylvania law, recognizes a child of divorced parents "belongs" in both households.

Three years after the Pennsylvania Superior Court's decision in *Amica*, our Court of Appeals in *Nationwide Mut. Ins. Co. v. Budd-Baldwin* confirmed the question of residency under an insurance policy is a question of law.[89] Our Court of Appeals also defined what it means to "regularly live" in an insured's household to come within the meaning of "relative" afforded coverage under an auto policy: "[I]t is clear that to occupy a home means to be able to call that place one's own, to claim it as a place where one has a right to be. The word home itself connotes a place where one belongs and can always go with the certainty that he will be taken in. It connotes not only a physical place, i.e. the place where one eats meals, sleeps, socializes and generally spends time when not 'otherwise engaged with the activities of life,' but a sense of belonging. This definition clearly excludes persons who are mere visitors to the residence, however frequently they may visit and however certain they may be that they will always be taken in. Temporary visits, however frequent or regular, are simply insufficient to establish residency."[90]

Applying this definition to the question of coverage under an insured's auto policy seeking underinsured motorist benefits for the loss of her brother killed in an auto accident, our Court of Appeals found the brother was a visitor to his sister's household and, "however frequent or

welcome his visits might have been, he did not 'regularly live' in her household; it was not the place where he belonged.'"[91]

Contrasting the deceased brother's connection to his sister's household, our Court of Appeals distinguished "this situation from countless others in which persons stay temporarily at the home of another but have a more established connection with the household. The best example which comes to mind is that of children of divorced parents who live with one parent most of the time but routinely spend a portion of each week or month at the residence of the non-custodial parent. In such cases, the child usually, for the sake of convenience if nothing else, has a room to call his or her own in each residence, keeps clothes, books, games, etc. in each residence, and visits at the non-custodial parent's home at regularly scheduled intervals. What distinguishes that situation from the one before us is that the child 'belongs' at the other parent's residence, i.e. has a place there to call his or her own, and that the central purpose of the visit is to spend time with the parent. The child is as much a part of that household as he or she is of the household of the parent with primary custody."[92]

### 3. Alyssa resided in her father's household in 2018 as a matter of law.

Esurance does not dispute the Pennsylvania Superior Court's *Amica* decision confirmed a child of divorced or separated parents may be regarded as a resident of the household of both parents.[93] It instead argues *Amica* does not automatically render a child of separated parents a resident of both her parent's households. We agree. It then argues the facts show Alyssa is not a resident of her father's household. We do not agree and instead must review the totality of undisputed facts.[94] But those facts confirm her residency in her father's household.

Pennsylvania's appellate court's reasoning in *Amica* is our guidepost since it addressed the residency issue of children of divorced or separated parents. To be sure, the Pennsylvania Superior

Court rejected the argument Pennsylvania should adopt a test of "dual residency" where a child of divorced or separated parents are held to reside with both parents.[95] The Superior Court explained: "Although no Pennsylvania appellate decision has yet decided the issue, we do not disagree that a child of separated or divorced parents may be regarded as a resident of the household of both parents. Such a holding would seem appropriate where . . . the child divides [her] time between the two."[96] But finding a child is a resident of both parent's households is "less compelling" where the child visits a parent and "occasionally" stays overnight and has not  "spent significant amounts of time" at the parent's house.[97]

Critical to our analysis today are the state court orders, the first entered in 2007 and the second in 2018, governing Kimberly Hillmer's and Michael Black's custody over Alyssa. Courts ordered Alyssa to live with her father for certain scheduled times in 2018. Under the 2018 court order, Michael Black "shall enjoy partial physical custody of [Alyssa] as follows: a. Up to six (6) consecutive weeks each summer with the specific dates and times to be agreed upon by and between Mother and Father. b. The fall, winter and spring breaks from school with the specific dates being determined based on the school schedule/calendar and agreement of the parties."[98] Kimberly Hillmer "shall pay the airfare for [Alyssa] to travel to and from Father's to effectuate Father's periods of partial physical custody outlined herein."[99] The court's orders required Michael's custody over Alyssa at the designated time. Before moving to Florida, and under the 2007 court order, Alyssa spent two weekends each month living at her father's home throughout each calendar year, Thanksgiving, alternating Christmas and New Year holidays, as well as two weeks over summer break. Alyssa maintained her own bedroom and kept personal belongings at her father and stepmother's house. Her father maintained custody of Alyssa and her mother described their living and parenting situations as "equal."

After moving to Florida, Alyssa and her family honored the court order and she returned to her father's home for six weeks in the summer of 2018 and holiday breaks. Routinely planned visits over school breaks maintained Alyssa's presence and connection with her father's household. Alyssa's regular visits at the time of the accident maintained her status as a member of her father's household.

We disagree with Esurance's characterization of Alyssa's connection to her father and stepmother's household. It argues Alyssa's return to her father's home "three or four times a year when school was not in session" is not quantitatively sufficient to constitute residency there. It argues Alyssa "would only be considered a resident of the Black's household if she were physically living there roughly the same amount of time that she was physically living in Kimberly Hillmer's home."[100] Esurance appears to cite *Amica* to support its "roughly equal" argument.

The Pennsylvania Superior Court in *Amica* did not set out a "roughly equal" or other quantitative test to determine residency. It explained it is appropriate to regard a child of separated or divorced parents as a resident of the household of both parents where "the child divides [her] time between the two."[101] The Superior Court did not mandate an "equal division" of time and simply contrasted the situation where a child divides her time between her parents with a child visiting a parent and "occasionally" staying overnight. Not only does the Superior Court in *Amica* not mandate an "equal" living arrangement, Judge Bloch, our colleague in the Western District of Pennsylvania, recently explained "[t]here is no specific amount of time a person must stay at a place to make it his or her residence, but courts have commonly found that those who sleep at a place no more than once a week or so are not residents of that place."[102]

The cases cited by Esurance in support of its argument are distinguishable. Our Court of Appeals in *McGeehan* found an adult son and his wife visiting his parents for Thanksgiving were

not residents of his parents' household.[103] We cannot find an adult married couple visiting with the husband's parents analogous to Alyssa, a sixteen-year-old girl whose parents have a court ordered custody arrangement.

The facts of *Amica* are similarly distinguishable. In *Amica*, an eighteen-year-old high school senior lived with her mother but stayed with her father three to five times a month. The father contradicted his daughter, testifying she stayed overnight only twice during the entire school year. Under these facts, the Pennsylvania Superior Court affirmed the trial court's finding the daughter made only "sporadic" visits to her father's home over the course of ten months and "spent no significant time there."[104] We find the facts surrounding Alyssa's living arrangements distinguishable from the eighteen-year-old's "sporadic" visits to her father's home.

Esurance's citation to *St. Paul Fire & Marine Insurance Co. v. Lewis* is similarly distinguishable. The district court found an adult child living in his own apartment did not have the requisite contacts with his parents home to be considered "living with" them for purposes of coverage under the parents' insurance policy.[105] Our Court of Appeals affirmed and found the insurance policy required a party "have at least some regular, personal contacts with the insured's residency" and concluded the adult child did not have such contacts with his parents in the absence of evidence the adult child's visits occurred with any frequency or the adult child slept or took meals there with any regularity.[106] Again, we cannot find an adult child living in his own apartment with no evidence of "at least some regular, personal contacts" with this parents' home analogous to the facts here.[107]

Considering the undisputed facts here, Alyssa is a resident of her father's household. The facts here are more like cases finding a child a resident of another family member's home. For example, in *GEICO Casualty Co. v. Alicea*, Judge Bloch found a granddaughter a resident of her

grandparents' home where evidence showed the granddaughter slept at her grandparents' home in a consistent, "and almost constant," basis in a dedicated bedroom, where she kept her clothes, and her grandparents took her to school.[108] Judge Bloch explained the "key factor" courts consider is whether contact with a household is regular or sporadic; "there must be a sense of permanency or habitual repetition" and "[p]ersons who have been found to reside at a certain place have demonstrated an 'established pattern of spending significant time' there . . . and that they maintained their contacts as part of a regular pattern."[109] Judge Bloch distinguished this from "persons with only occasional or sporadic contact with a residence."[110]

In another example, the Pennsylvania Commonwealth Court found an insured's minor son a resident of the insured under an auto policy.[111] In that case, the Commonwealth Court found the evidence showed the minor son "established a pattern of spending significant time at both his mother's house and father's house" by showing he divided his time between his parents' homes, but never stayed with either for more than six months; he accepted support from whichever parent he then lived with; did not own any property and took only his clothes with him between his parents' houses; he could have received important mail at either parent's house; and had a personal bedroom for his use at both homes.[112] The Commonwealth Court found these facts evidenced the son's residence at both homes, even though his mother evicted her son from her home three or four weeks before the car accident but then mother took the son back to live with her immediately after the accident.[113] The Commonwealth Court affirmed the trial court's finding the son was a resident at the time of the accident as supported by "substantial evidence." Further, the Commonwealth Court noted the parents did not have a custody agreement over the son which would "mandate [son's] presence in either household for a particular period of time" but nevertheless found the son a resident of his mother's home despite not living with her at the time of his car accident. This

suggests the Commonwealth Court would give weight to a custody agreement, as we have here in Alyssa's case, mandating a child's presence in the parents' households.

These cases support a finding Alyssa is a resident of her father's household. A state court judge ordered Alyssa to stay with her father on certain scheduled time during 2018. Her family complied with the terms and spirit of the order. Alyssa's parents' regular routine and use of their custody agreement as a goal schedule created substantial contacts between Alyssa and her father's household despite the physical distance and time spent at her mother's household through the school year. The parents' routine visits and collective attempts to parent lead to an expectation of Alyssa's periodic return to her designated bedroom in her father's household during breaks from school.

## III.   Conclusion

We today address whether a high school student subject to a detailed joint custody order may obtain insurance coverage under her father and stepmother's underinsured motorist insurance policy when the insurer requires she "reside" in their household. She alleges she suffered serious injuries after being hit by a car walking to school in Florida when she stayed in her mother's Florida home and a court order required she visit her father in Pennsylvania for extended intervals over summer, winter, and spring breaks from school. The student seeks underinsured motorist coverage from her father's auto insurer for the accident because of her residency in her father's household. We agree. The student's  court ordered scheduled pattern of visitation at her father's household at the time of the accident establishes her residency at his home. Regular stays at fixed times of the year established her status as a member of her father's household entitled to underinsured motorist coverage.

---

[1] Our Policies require a Statement of Undisputed Material Facts ("SUMF") and an appendix in support of summary judgment. Alyssa filed her Motion and brief in support of summary judgment and SUMF at ECF Doc. Nos. 23, 23-1 and 24; Esurance responded at ECF Doc. No. 29; Esurance filed a Statement of Material Facts in Opposition to Plaintiff's Material Facts at ECF Doc. No. 29-2. Esurance filed its Motion and brief in support of summary judgment and SUMF at ECF Doc. Nos. 22 and 22-1; Alyssa responded at ECF Doc. No. 27. The parties filed a Joint Appendix at ECF Doc. No. 25. Esurance filed a Supplemental Appendix at ECF Doc. 29-1.

[2] ECF Doc. No. 25, Joint Appendix 128, 221, 393, 505.

[3] Joint Appendix 241.

[4] Joint Appendix 375-78.

[5] Joint Appendix 375-78. The Court of Common Pleas of Lackawanna County entered an Order on December 10, 2007 approving the parties' agreement.

[6] Joint Appendix 239, 319-21, 322.

[7] Joint Appendix 238.

[8] Joint Appendix 532-33; ECF Doc. No. 24, Hillmer SUMF, ¶¶ 25-26.

[9] Joint Appendix 532-33.

[10] ECF Doc. No. 24, Hillmer SUMF ¶ 31.

[11] Hillmer SUMF ¶ 28.

[12] Hillmer SUMF ¶ 32.

[13] ECF Doc. No. 25, Joint Appendix 535.

[14] Joint Appendix 535.

[15] Joint Appendix 259. Alyssa could not visit her father in 2020 due to COVID-19 travel restrictions. Joint Appendix 255-56. She began college in fall 2020 at Hillsborough Community College in Florida and continued to live with her mother. Joint Appendix 135-37. Alyssa turned eighteen in September 2020. She returned to Michael and Marnie's Pennsylvania home in the summer 2021 and can now, as an adult, visit the Blacks as she wishes.

[16] Joint Appendix 372-74.

[17] *Id.*

[18] Joint Appendix 374.

[19] Joint Appendix 221.

[20] Joint Appendix 252-53. We appreciate Alyssa's living arrangements after the occurrence are of less import but may establish a confirmed expectation and pattern of permanency or habitual repetition leading to a finding of residency. *Erie Ins. Exchange v. Flood*, 649 A.2d 736, 739 (Pa. Commw. Ct. 1994).

[21] Joint Appendix 253-54.

[22] Joint Appendix 253-54.

[23] Joint Appendix 254.

[24] Joint Appendix 100.

[25] Joint Appendix 101.

[26] Joint Appendix 101. Michael and Marnie Black have two children together both of whom are under the age of fourteen. Joint Appendix at 530.

[27] Joint Appendix 542.

[28] Joint Appendix 543-44.

[29] *Id.*

[30] Joint Appendix 544-45.

[31] Joint Appendix 545-46.

[32] Joint Appendix 1.

[33] Joint Appendix 3.

[34] *Id.*

[35] The Policy provides:

**INSURING AGREEMENT: UNDERINSURED MOTORIST COVERAGE**

In return for payment of the premium for this coverage when due, and subject to the limits of liability, ***"we"*** agree with ***"you"*** as follows:

1. *"We"* will pay compensatory damages that an *"insured"* is legally entitled to recover from the *"owner"* or operator of an *"underinsured motor vehicle"* because of *"bodily injury"*:

    A.  Sustained by an *"insured"*; and

    B.  Caused by an *"accident"*.

The liability of that *"owner"* or operator for these damages must arise out of the ownership, maintenance, or use of the *"underinsured motor vehicle"*.

Joint Appendix 19-20.

[36] Joint Appendix 20, ¶ 1.

[37] Joint Appendix 9, ¶ 9.

[38] Joint Appendix 9, ¶ 10.

[39] ECF Doc. No. 1.

[40] ECF Doc. No. 25, Joint Appendix 393. The current cross-motions for summary judgment pertain only to Alyssa's residency issue, not damages.

[41] ECF Doc. No. 29-1, Esurance Supplemental Appendix 574-78.

[42] ECF Doc. No. 25, Joint Appendix 115-119.

[43] *Id.*

[44] ECF Doc. No. 1.

[45] Summary judgment is proper when "the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.'" *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011)). On a motion for summary judgment, "we view the facts and draw all reasonable inferences in the light most favorable to the nonmovant." *Pearson*, 850 F.3d at 533-34 (3d Cir. 2017) (citing *Scott v. Harris*, 550 U.S. 372, 378 (2007)). "The party seeking summary judgment 'has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact.'" *Parkell v. Danberg*, 833 F.3d 313,323 (3d Cir. 2016) (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015)). If the movant carries its burden, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their case for which they have the burden of proof." *Willis*, 808 F.3d at 643 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If, after adequate time for discovery, the nonmoving party has not met its burden, pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against the nonmoving party." *Willis*, 808 F.3d at 643 (citing *Celotex Corp.*, 477 U.S. at 322-323).

"This standard does not change when the issue is presented in the context of cross-motions for summary judgment." *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (quoting *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987)). "When both parties move for summary judgment, '[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'" *Auto-Owners Ins. Co.*, 835 F.3d at 402 (quoting 10A Charles Alan Wright et al., FEDERAL PRACTICE & PROCEDURE § 2720 (3d ed. 2016)).

[46] ECF Doc. No. 22 at 10; ECF Doc. No. 23-1 at 6.

[47] *Am. Auto. Ins. Co. v. Murray*, 658 F.3d 311, 320 (3d Cir. 2011) (quoting *Home Ins. Co. v. Law Offices of Jonathan DeYoung*, 32 F. Supp. 2d 219, 223 (E.D. Pa. 1998)).

[48] *Westport Ins. Corp. v. Hippo Fleming & Pertile Law Offices*, 791 F. App'x 321, 323 (3d Cir. 2019) (citing *Frog, Switch & Mfg. Co. v. Travelers Ins. Co.*, 193 F.3d 742, 745-46 (3d Cir. 1999)); *Am. Auto Ins. Co.*, 658 F.3d at 320 (citing *C.H. Heist Caribe Corp. v. Am. Home Assurance Co.*, 640 F.2d 479, 481 (3d Cir. 1981)).

[49] *Am. Auto. Ins. Co.*, 658 F.3d at 320-21 (quoting *Melrose Hotel Co. v. St. Paul Fire & Marine Ins. Co.*, 432 F. Supp. 2d 488, 495 (E.D. Pa. 2006)).

[50] *Gen. Refractories Co. v. First State Ins. Co.*, 855 F.3d 152, 158 (3d Cir. 2017) (quoting *Donegal Mut. Ins. Co. v. Baumhammers*, 938 A.2d 286, 290 (Pa. 2007)).

[51] *Lomma v. Ohio Nat'l Life Assurance Corp.*, 788 F. App'x 104, 107 (3d Cir. 2019) (citing *Minn. Fire & Cas. Co. v. Greenfield*, 855 A.2d 854, 861 (Pa. 2004)).

[52] *Am. Auto. Ins. Co.*, 658 F.3d at 321 (quoting *Med. Protective Co. v. Watkins*, 198 F.3d 100, 103 (3d Cir. 1999)).

[53] *Lomma*, 788 F. App'x at 107.

[54] *Id.* (quoting *Gardner v. State Farm Fire & Cas. Co.*, 544 F.3d 553, 558 (3d Cir. 2008)).

[55] *Id.* (quoting *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999)).

[56] Esurance identifies the Application as "part of, and form, your policy," so we consider both the Application and Policy's language to determine the ambiguity of the contract. *See* ECF Doc. No. 25, Joint Appendix 5. We find no reason to examine the Application's ambiguity. Marnie Black's understanding of residency in the Application or her expectations and intents are not material. We agree with Esurance as to the limited probative value of information contained in the Application.

[57] Joint Appendix 9, ¶ 9 (emphasis added).

[58] Joint Appendix 9, ¶ 10.

---

[59] As an aside, the parties do not appear to be arguing different constructions of the terms "resident" or "reside." They are arguing whether, under the facts of this case, Alyssa "resided" in her father's household at the time of the accident. This is not a question of ambiguity, but of the quantity and quality of Alyssa's contacts with her father's household to be qualified as a "resident" of his household. *See e.g. Erie Exchange v. Weryha*, 931 A.2d 739, 742-43 (Pa. Super. Ct. 2007) (the term "resident" is unambiguous because the insurer and policy holder are not advocating a different construction of the policy language, but of the quantity and quality of child's contacts with father's household for a finding of "residency" under the policy).

[60] *First Liberty Ins. Corp. v. McGeehan*, 809 F. App'x 75, 78 (3d Cir. 2020) (quoting *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 419 (3d Cir. 2011)).

[61] *McGeehan*, 809 F. App'x at 78 (quoting *Lawson v. Fortis Ins. Co.*, 301 F.3d 159, 163 (3d Cir. 2002) then citing *Trombetta v. Raymond James Fin. Servs., Inc.*, 907 A.2d 550, 562 (Pa. Super. Ct. 2006)).

[62] 649 A.2d 736 (Pa. Commw. Ct. 1994).

[63] 39 Pa. D. & C. 3d 254 (Mercer Cnty. Ct. Com. Pl. May 8, 1986).

[64] 450 A.2d 736 (Pa. Super. Ct. 1982).

[65] We are aware of a recent decision by our distinguished colleague Judge Jones in *Amica Mut. Ins. Co. v. Das*, No. 18-1613, 2021 WL 1209747 (E.D. Pa. Mar. 30, 2021). In *Das*, the parties disputed whether Anita Das, a graduate student living in Philadelphia and injured after being hit by a car while riding her bicycle, is a "resident relative" entitled to coverage under her parents' auto policy. The parents lived, for at least part of the time, in Indiana. Judge Jones found there are at least two reasonable interpretations of the term "resident relative" making it ambiguous: "as a modifier, the term 'resident' may connote a qualifying relative who is physically present in the household address provided in an insurance policy" and the term "'resident' may also apply to a qualifying relative whose permanent address is the household address in the insurance policy but may temporarily stay at other addresses." *Id.* at * 5. Judge Jones analogized the second possible definition to our Court of Appeals' "sense of belonging" analysis in *Budd-Baldwin*.

We do not find the term "resident" ambiguous. Even if we did so find, it does not change our conclusion Alyssa is a "resident" of her father's "household."

[66] *Flood*, 649 A.2d at 737.

[67] *Id.* at 738 (citing *Amica Mut. Ins. Co. v. Donegal Mut. Ins. Co.*, 545 A.2d 343 (Pa. Super. Ct. 1988)).

[68] *Id.* at 739.

[69] *GEICO Cas. Co. v. Alicea*, 416 F. Supp. 3d 425, 432 (W.D. Pa. 2019) (collecting cases).

26

[70] *Frazier*, 39 D. & C. 3d at 257.

[71] *Id.* at 263-64.

[72] *Id.* at 265.

[73] 450 A.2d at 737.

[74] *Id.* at 738.

[75] *Id.*

[76] *Id.*

[77] 809 F. App'x 75 (3d Cir. 2020).

[78] *Id.* at 80 (collecting cases).

[79] *Amica Mut. Ins. Co. v. Donegal Mut. Ins. Co.*, 545 A.2d 343, 346 (Pa. Super. Ct. 1988).

[80] *Id.*

[81] *Amica*, 545 A.2d at 348.

[82] *Id.* at 344, n.1.

[83] *Id.* at 346.

[84] *Id.*

[85] *Id.* at 346 (quoting *Krager*, 450 A.2d at 738).

[86] *Id.* at 346.

[87] *Id.*

[88] *Id.* at 349.

[89] 947 F.2d 1098 (3d Cir. 1991).

[90] *Budd-Baldwin*, 947 F.2d at 1102 (footnote omitted) (citing *Donegal Mut. Ins. Co. v. State Farm Mut. Ins. Co.*, 546 A.2d 1212, 1214 (Pa. Super. Ct. 1988)).

[91] *Id.* at 1103.

[92] *Id.*

---

[93] ECF Doc. No. 29 at 7.

[94] Commentators surveying cases around the country confirm the soundness of Pennsylvania's totality analysis. "There are multiple factual circumstances that can have an effect on a child's status as a resident of their parents' household, especially divorce and separation. The focus of the determination of a child's residence is on a continuing connection between the child and the parent. In order for a child to qualify as a resident of a parent's household, there must be more than periodic or intermittent social visits. There must be evidence of continuity of existence or intended continuity of existence at the parent's home. While this continuity does not require the level of permanence associated with a domicile, it requires something more than a mere temporary sojourn or visit. In the context of divorce or separation, legal custody of the child is just one of the many factors to consider when determining a child's residence. More significantly, it must be shown that the child spent regular and significant time at the parent's home, and there must be a continuing expectation of the child's return to the home. If this can be shown in relation to both parents, the child of divorced or separated parents can be a resident of either household for the purposes of being insured under the homeowners' policy of each." 9A Steven Plitt *et al.*, Couch on Insurance § 128.8 (3d ed. June 2021 update).

[95] *Amica*, 545 A.2d at 348.

[96] *Id.*

[97] *Id*.

[98] ECF Doc. No. 25, Joint Appendix 373.

[99] Joint Appendix 374.

[100] ECF Doc. No. 22 at 15.

[101] *Amica*, 545 A.2d at 348.

[102] *Alicea*, 416 F.Supp.3d at 433.

[103] *McGeehan*, 809 F. App'x at 79-80.

[104] *Amica*, 545 A.2d at 346.

[105] 935 F.2d 1428 (3d Cir. 1991).

[106] *Id.* at 1433.

[107] We similarly distinguish Judge Jones's recent decision in *Das* on its facts.  Anita Das, a graduate student at the University of Pennsylvania, lived in Philadelphia when a car hit her while she rode her bicycle. Anita grew up in her family's home in the Philadelphia suburbs. Anita's parents moved to Indiana during the last year of her undergraduate studies in 2009. In a seven year period from

2009 to 2016, when she began graduate school, Anita visited her parents' Indiana home: in the summer of 2009; fall of 2012 where she switched her driver's license and voter registration, but then left to live with her brother in New York City; Christmas 2012 for two months; May 2013 for three weeks; mid-2015 for three weeks when she left to travel for a year; and June 2016 to help her parents pack the Indiana home to return to the Philadelphia suburbs. When she began graduate school in 2016, Anita gave the University her parents' address at their home in Manhattan. She went to her parents' Manhattan apartment after her accident. *Id.* at *6-8. The parents' auto policy became effective in August 2016; but the father had been living in New York at that time and the mother moved from Indian that same month. All these facts, including the fact the insured parents were themselves not residing in Indiana at the time of the accident, lead Judge Jones to conclude Anita was not a "resident relative" at the time of the accident. *Id.* at *8. He found these "occasional, sporadic, and temporary contacts" with the parents' Indiana home insufficient to establish residency. *Id.* These facts are entirely different from Alyssa's residential arrangements who, as the undisputed facts confirm, is far from a visitor in her father's home, but a minor resident living with her father several times a year on defined dates for extended stays under the terms of a court order.

[108] *Alicea*, 416 F.Supp.3d at 433-34.

[109] *Id.* at 433 (citations omitted).

[110] *Id.*

[111] *Erie Ins. Co. v. Flood*, 649 A.2d 736 (Pa. Commw. Ct. 1994).

[112] *Id.* at 739.

[113] *Id.*